**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**CHRISTOPHER R. MULLINS,**

　　**Plaintiff,**

**vs.**　　　　　　　　　　**CASE NO. 3:20-CV-00032-LC-MAF**

**SEC'Y, DEP'T OF CORR.
STATE OF FLORIDA,**

　　**Defendant.**
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court upon a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, by Petitioner, Christopher R. Mullins, a convicted state felon, challenging the constitutionality of his conviction and sentence for twenty-five counts of possessing photographs, motion pictures, etc., which include sexual conduct by a child, in violation of Fla. Stat. §§ 827.07(5) and 775.0847, the result of *nolo contendere* plea in the Circuit Court of the First Judicial Circuit in and for Okaloosa County, Case No. 2015CF001830F.

The Court reviewed the petition (ECF No. 1), together with the State's Answer (ECF No. 9) along with its supporting exhibits consisting of all pertinent portions of the underlying criminal file in the State's case against

Petitioner, as well as the subsequent appellate filings and decisions. ECF

No. 10. Plaintiff's Amended Reply has also been considered. ECF No. 18.

For the reasons stated, this § 2254 petition should be DENIED.

## I.   Claims

Petitioner, essentially, raises two claims within his § 2254 petition:

1. The actions of the OSI[1] agents during the interrogation conducted on April 6, 2015, rendered Petitioner's statements involuntary when:

    a. prior to the <u>Miranda</u>[2] warning, OSI agents deliberately misrepresented their role by portraying their primary role as administrative, failed to explain the true purpose of the interview, and told him they needed to talk to him so the commanding officer would know the full story. <u>Id</u>., pp. 8-10.

    b. OSI agents downplayed the significance of <u>Miranda</u>. <u>Id</u>., p. 10-11.

    c. When OSI agents read the <u>Miranda</u> warning to Petitioner, they limited Petitioner's ability to ask questions during the interrogation by restricting his answers to "yes" or "no." <u>Id</u>., p. 12.

2. The state trial court erred by denying Petitioner's Motion to suppress because the agents' actions rendered Petitioner's statements and consent to search involuntary. <u>Id</u>., p. 4.

---

[1] The Report uses the abbreviation "OSI" for the United States Air Force Office of Special Investigation. The investigative agents are referred to throughout as "OSI agents."

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

## II.   Procedural and Factual Background

### A. The Interview by OSI Agents

Petitioner was a 21-year old, enlisted member of the United States Air Force, on April 6, 2015, when he was interviewed by two OSI agents (Agents Lee and Wilson) investigating allegations made by a fellow service member that Petitioner possessed inappropriate images of children.[3] The interview was conducted at Hurlburt Field Air Force Base (Petitioner's duty station). ECF No. 1, p. 5. Petitioner held a "secret" level "security clearance" and was assigned to the "maintenance squad." R. 988-89. A commanding officer escorted Petitioner to OSI. R. 516.

During the first hour of the interview and prior to the advisement of Article 31(b) rights, Petitioner provided agents with biographical and personal information (unrelated to the allegations); and agents explained the role of OSI, the process of reporting the findings to the commanding officer, and the nature of the suspected offenses. R. 752-817. Agents read Petitioner the Article 31(b) rights. 815-17. Petitioner confirmed he understood his rights, declined representation by "military counsel" or "civilian counsel," and

---

[3] See entire transcript of the OSI interview at R. 746-1030.

agreed to answer the agents' questions. R. 816. Thereafter, OSI agents questioned Petitioner about the allegations. R. 819-1030.

At the end of questioning, Petitioner gave OSI agents verbal and written consent to search his room, desktop and laptop computers, and electronic devices and consented to a search by the sheriff's department. R. 969-83; 995-1006; 1014-17. At one point, Petitioner stated, "I feel better that I actually told y'all everything." R. 1010. In total, the interview (pre- and post-<u>Miranda</u>) lasted approximately seven hours and fifteen minutes.

B. <u>Information Filed and Motion to Suppress</u>

Petitioner was charged by the state in an amended information with the twenty-five counts. R. 56-66. Petitioner's counsel[4], filed a motion to suppress his statements to OSI agents and argued agents' actions rendered the waiver involuntary and were in violation of his constitutional rights and <u>Miranda</u>. R. 85-97.

The trial court held a suppression hearing on June 22, 2016. R. 512-91. Parties stipulated that Petitioner "was in custody at the time he was interviewed and Mirandized." R. 516. Agent Wilson testified that he and Agent Lee conducted Petitioner's interview and part of the initial process is to complete certain biographical information "as soon as we enter the room"

---

[4] Petitioner was represented by M. James Jenkins, Esq.

prior to an advisement of rights. R. 512-28. Wilson confirmed that Petitioner was briefed to give him a general understanding that they investigated crimes in the military; and Petitioner knew he was under investigation before making statements because he was flagged for investigation. R. 534, 547-48. Wilson testified that Petitioner provided written consent to search his residence for electronic media, left headquarters with his supervisor, and was present with local law enforcement during the search. R. 535-39. Wilson explained that the military form 1168 contains the statement that a suspect understood his rights; and Petitioner initialed that section. R. 542. The military does not require a separate, written waiver of an Article 31 advisement. R. 543-44. No other witnesses were presented.

The videos of the interview (pre- and post-Miranda) were admitted into evidence. R. 567-68. Based on the totality of the circumstances, the trial court found Petitioner voluntarily waived his Miranda rights and then denied the motion to suppress. R. 585-89; see also Order on Motion to Suppress at R. 117. Specifically, the court made several findings. Petitioner was not "cajoled" or "trick[ed]" into waiving his rights. R. 586. Although Petitioner was 21, had "limited" experience, and had a "sheltered" background, there was no "reason to believe that [he did not] have average or above average intelligence." R. 587. There was no written waiver of his rights. Id. The

interview room was small and did not have windows. There was "some evidence" of "the minimalization of Miranda." R. 588-89. Ultimately, the court found that Petitioner's statements were "the product of free and deliberate choice rather than intimidation . . . [or] coercion." R. 587-88. Petitioner "did have a full awareness of both the nature and the rights about" the waiver; and there was no evidence Petitioner was in "distress" in the interrogation video nor was their "anything that made [the court] believe that [Petitioner was not] fully aware of those rights." R. 588. Petitioner had "a full awareness" of the nature of the interview and abandoned his rights. Id.

C. Plea, Sentencing, and Appeal

On July 25, 2016, Petitioner entered a "no contest" plea to the charges in the amended information. See Plea Hearing Transcript at R. 320-27. Petitioner reserved the right to appeal the denial of the motion to suppress. R. 320-21.

On October 19, 2016, Petitioner presented for his sentencing hearing; counsel requested a downward departure based on his mental health history and level of cooperation. R. 328-510. Dr. Bingham and Dr. Harper both testified that Petitioner's mental condition was a mitigating factor. Dr. Bingham testified that Petitioner had no psychosis, anti-social personality disorder, or major mental disorders but acknowledged his history of

depressive disorder, anxiety disorder, ADD, and ADHD. R. 373, 375-76, 383-84. Dr. Bingham indicated that Petitioner understood that the acts he committed were wrong but could not appreciate the severity of his situation. R. 381. Petitioner's statements to OSI agents that he "was ruined" and his "life was over" indicated that he understood the consequences of his actions. R. 383. Similarly, Dr. Harper testified Petitioner suffered from "depressed mood and anxiety problems" that were "long-standing" and "some . . . sort of a mixed personality disorder." R. 425, 435.

Petitioner testified on his own behalf that he "never really felt normal or accepted," could not imagine the pain and suffering the abuse would cause children "but it haunts me every day. I've become a disappointment to my family, to my church, to all those who know me. I have no excuse for what I did." R. 459. Petitioner admitted that he tried to hide the evidence from investigators and had been viewing child pornography using his computer for years. R. 460-61.

Interestingly, Petitioner's counsel contended that the voluntariness of Petitioner's confession and level of cooperation with law enforcement supported a downward departure:

> He has cooperated with law enforcement. And that alone
> can be a basis for downward departure. I don't think the
> State would dispute that but for his confession, but for his
> willingness to even go to the OSI office and do everything

> else he did, such as sign waivers to let them search, you know, he gave up passwords . . . he provided his cell phone voluntarily. So, you know, . . . he actually thanks these agents for everything they're doing for him. And maybe he didn't even know it, but it might have been – the genesis of that might have been that he knows, hey, I've finally been able to talk to somebody . . . based on prior testimony from the motion to suppress from Agent Wilson, there's no doubt that he cooperated and he resolved – but for him, this case would not have been resolved.

R. 465-66. Counsel added that Petitioner "agreed to accompany a supervisor to the house where he signed another – a second consent to search . . . voluntarily submit[ed] to a polygraph . . . [and] being evaluated by a forensic mental health expert." R. 493. The Court found that there was no valid reason for downward departure based on cooperation but did so based on Petitioner's mental health issues because he was amendable to treatment. R. 500-03. The court sentenced Petitioner to seven years in prison followed by a ten-year probation term. R. 605-07.

Petitioner appealed the judgment and denial of the motion to suppress to the First District Court of Appeal in Case No. 1D16-5045. On September 27, 2018, the appellate court affirmed, *per curiam*, without a written opinion. Mullins v. State, 253 So. 3d 550 (Fla. 1st DCA 2018). Plaintiff's motion for modification of sentence pursuant to Fla. R. Crim. P. 3.800(c) was denied on January 9, 2019. ECF No. 10-8, p. 24. On January 8, 2020, Petitioner timely filed the instant habeas petition. ECF No. 1.

## III.   Timeliness and Exhaustion

Parties correctly maintain that the instant petition is timely and state remedies have been properly exhausted. ECF Nos. 1, 9.

## IV.   Discussion

### A. Standard of Review

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody. Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See, e.g., Cullen v. Pinholster, 563 U.S. 170, 180-83 (2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the

doubt.'" <u>Cullen</u>, 563 U.S. at 181 (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011), and <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002)). This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Id</u>.

     B. <u>Applicable Law Regarding Involuntary Statements and Confessions</u>

     The Fifth Amendment of the United States Constitution protects against self-incrimination. It is well settled that when an individual is taken into custody and subjected to questioning, he must be advised of certain rights including the right to remain silent; the right to the presence of an attorney during questioning; and, that if he cannot afford an attorney, one would be appointed if he so desired. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>Florida v. Powell</u>, 559 U.S. 50, 59-60 (2010). Although Petitioner raises his claims under <u>Miranda</u>, a brief discussion of Article 31(b) of the Uniform Code of Military Justice is warranted because the record is clear that OSI agents informed Petitioner of his rights pursuant to Article 31(b). R. 804-05, 814-15.

     Article 31(b) applies to members of the military and provides:

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made

by him may be used as evidence against him in a trial by
court-martial.

Article 31(b) is, necessarily, broader than Miranda. "Because of the
inherently coercive environment of the military command structure, more
self-incrimination protections have been given accused servicemen than
their civilian counterparts." Calley v. Callaway, 519 F.2d 184, 202 n.30 (5th
Cir. 1975).[5] There are two major distinctions. First, there is no custody
requirement as in Miranda; therefore, the Article 31(b) warning is required
whenever a service member is "suspected of an offense" and is being
interrogated. United States v. Baird, 851 F.2d 376 (1988). Second, the
service member must be informed of the nature of the offense suspected.
United States v. Rogers, 47 M.J. 135, 137 (C.A.A.F. 1997).

Nonetheless, the individual can knowingly and intelligently waive
these rights and agree to answer questions or make a statement. The
Eleventh Circuit has explained:

> For a waiver to be voluntary, knowing, and intelligent, (1)
> "the relinquishment of the right must have been voluntary
> in the sense that it was the product of a free and deliberate
> choice rather than intimidation, coercion, or deception";
> and (2) "the waiver must have been made with a full
> awareness of both the nature of the right being abandoned
> and the consequences of the decision to abandon it."

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit
handed down by the close of business on September 30, 1981.

Everett v. Sec'y Fla. Dep't of Corr., 779 F.3d 1212, 1241 (11th Cir. 2015).

citing Moran v. Burbine, 475 U.S. 412, 420-21 (1986).

The burden of proving involuntariness rests with the habeas petitioner.

Martin v. Wainwright, 770 F.2d 918, 925 (11th Cir. 1985). The petitioner must

prove that in light of "the totality of the circumstances surrounding the

interrogation," Fare v. Michael C., 442 U.S. 707, (1979), "his will has been

overborne and his capacity for self-determination critically impaired,"

Culombe v. Connecticut, 367 U.S. 568, 602 (1961). "Although the ultimate

issue of voluntariness is a legal question requiring independent federal

determination, state court findings of fact are afforded a presumption of

correctness under 28 U.S.C. § 2254(d)." Harris v. Dugger, 874 F.2d 756, 762

(11th Cir. 1989). The AEDPA provides that the petitioner bears "the burden

of rebutting the presumption of correctness by clear and convincing

evidence." 28 U.S.C. § 2254(e)(1).

C. Plaintiff's statements to OSI agents were not involuntary.

1) *Agents did not misrepresent their role as criminal investigators.*

Petitioner claims that "***at no time*** during the fifty-nine minutes prior to

the reading of Miranda did the agents ever explain to Petitioner Mullins that

their actual primary job is to conduct investigations into serious criminal

offenses or that they are criminal investigators." ECF No. 1, p. 9 (emphasis

added). The state correctly asserts that the record refutes the claim because Petitioner acknowledged he was aware of the investigations and agents provided him with hypothetical examples to illustrate what they do. ECF No. 9, pp. 16-17.

Although Petitioner points to the more casual parts of the interview to support his argument, the record contradicts the claim. At the outset, Petitioner knew the purpose of meeting with OSI because "promotions" "told me that I was under investigation." R. 753-54. In fact, during the suppression hearing both the prosecutor and Petitioner's counsel confirmed that Petitioner was escorted by a commanding officer to OSI due to the investigation. R. 516-17. Pre-Miranda, Petitioner explained that "in June" he reviewed his "LES" to check his leave balance and noticed what he believed was an error in his rank: "it said E3[6] at the top and I was, like, that can't be right, you know." R. 753. This error led Petitioner to inquire with the "finance" division who then referred him to the "promotions" division. R. 753-54. "Promotions" informed Petitioner he "was under investigation," asked him if he could "remember anything that happened"; but Petitioner said he "couldn't really think of anything." R. 753-54. Wilson explained to Petitioner that OSI

---

[6] E-3 is the paygrade for an enlisted Airman First Class in the United States Air Force. https://www.federalpay.org/military/air-force/ranks. Accessed 7/22/2021.

"might get information in and we look into it and sometimes it gets flagged and, you know, then you go to check your leave or your pay and then figure out, oh, sh\*t." R. 754. Sometimes the flag gets "cleared"; "a lot of times [OSI does not] even talk to people." R. 754. Post-<u>Miranda</u> and near the end of interrogation, Petitioner confirmed he knew of the OSI investigation several days earlier on "Thursday" (April 2, 2015). R. 984-85.

Before explaining OSI's role, Wilson asked Petitioner if he was familiar with OSI and if he ever encountered a situation with OSI. R. 755. Petitioner replied, "not too much," but shared an incident where OSI came and "arrested a couple of guys in the room" while he was at "CPAC." R. 755-56. Wilson denied performing in that manner because it portrays OSI negatively, fails to maintain the privacy of the individual, and because it is possible the matter may not be a real issue. R. 756. Wilson added:

> . . . you know, like you said, you've been flagged since June. We want to maintain your privacy until we sort out things and say, hey is there anything here . . . So you would imagine if you had known since June . . . that we were looking into something and it would just be something that would eat at you for a while. And then sometimes it's not even – it won't even be an issue. So today is sort of the day that we just want to give you the opportunity. We're going to explain, like what's going on based on the information we have and, you know, just – just have a conversation. . .
> I do apologize, I know that was probably not the best thing to go and find out at finance that, you know, you're flagged.

R. 757.

At that point, Petitioner responded to several preliminary questions regarding his background, social security number, living arrangements, date of birth, educational background, high school ROTC, period of enlistment and goals; and they casually discussed video games. R. 757-91. Lee asked Petitioner if he understood the role of OSI; and Petitioner responded, "Special investigations, you know, they delve into what, I guess uniform people cannot do." R. 792. Lee replied, "I mean, you're kind of in the . . . right vicinity" but clarified that OSI investigates various allegations "rang[ing] from" positive drug screens "to theft of government property":

> our main primary job . . . is that we -- we just talk to people . . . You know, I would say four out of five days a week I'm talking to somebody and running investigations . . . we tend to take – take an allegation, which is one side of the story and we'll run an investigation . . . talking to the individual that might be accused, you know.

R. 792-93; see also R. 797-98 giving sexual assault as an example.

Agent Lee continued:

> But sometimes when we talk to people, too, depending upon the nature of the conversation, we have to, you know, advise people of their rights. And really what that means is most people don't understand what their rights are in the constitution, so our job is to kind of advise them of that so they know what their rights are.

R. 794-95; see also R. 804 referring to rights pursuant to Article 31(b). Agent Lee explained:

> we run an entire investigation . . . we take our complete investigation, whether someone decides to talk to us or not . . . and we give it to the commanders and let the commanders make decisions. . . in all reality, we're just the people that are trying to . . . collect information . . .

R. 795-96; see also R. 808. Wilson asked Petitioner whether he ever had his rights read to him; and Petitioner said, "No." R. 804. Wilson provided additional examples where the advisement of "the Article 31 rights" would be appropriate when soliciting "information" from individuals including allegations of "sexual assault," "using drugs," and "possession of marijuana," R. 797-98, 804-05. In sum, the agents informed Petitioner not only of the OSI's role in the military -- to investigate criminal allegations (by providing him with multiple examples) -- but also informed him of their investigative process and requirement to report findings to commanding officers.

Petitioner's claim that agents "manipulated" him by talking "about **everything** under the sun **but** the true purpose of what the agents' true role [was] or why he was being interviewed," is, simply, inaccurate. Petitioner knew why he was being interviewed and was informed of the role of OSI and the investigative process prior to the reading of his Article 31(b) rights.

The trial court adjudicated this claim on the merits following a suppression hearing. R. 85-107; 512-91. The decision was affirmed on appeal. Mullins v. State, 253 So. 3d 550 (Fla. 1st DCA 2018). The decisions

of the state and appellate courts were not contrary to nor involved an unreasonable application of clearly established federal law and were reasonable determinations in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, this claim should be DENIED.

### 2) *Agents did not deliberately minimize the significance of <u>Miranda</u>.*

Petitioner claims that agents overcame his free will by minimizing the significance of <u>Miranda</u>. ECF No. 1, pp. 10-11. He argues that agents portrayed <u>Miranda</u> as little more than an administrative or casual conversation and gave him an example of a relative who was arrested on the television program "Cops." <u>Id</u>., pp. 11-12. The state asserts that agents did not obtain a confession before administering <u>Miranda</u>, that the pre-<u>Miranda</u> questioning was akin to eliciting biographical information rather than obtaining inculpatory admissions, and Petitioner voluntarily waived his rights prior to being questioned about the allegations against him. ECF No. 9, pp. 17-20. In his reply, Petitioner reiterates the claim and relies on <u>Ross v. State</u>, 45 So. 3d 403, 428-29 (Fla. 2010). ECF No. 18, pp. 3-4. Petitioner's claim fails.

Petitioner focuses on certain statements to suggest that OSI agents meant to portray the interview as purely administrative:

- . . . So when we start talking about, you know, rights advisement, so we can have a conversation, they get

really tense, worked up. And really what we want people to do is to stay relaxed and understand that just a step for us to have a conversation . . . ECF No. 1, p. 11 citing R. 795.

- But 99 percent of the time that we talk to people, you know, we want to sit down to them, we're going to you know, advise them of their rights, the Article 31 rights. It's not the end of the world. Have you ever had your rights read to you for any reason? . . . (agent continues to tell two stories). Id. citing R. 804-08.

- And then what we'll do after that is we'll open up the dialogue and continue, you know to have a good ole time, I guess, you know, is the best way to put it. Id., p. 12 citing to R. 815.

- Other statements by agents that the interrogation is not like what happens on the television show "Cops." Id. citing R. 814-15.

However, an evaluation of these statements in isolation without considering the totality of the circumstances conflicts with what the law prescribes. It bears repeating that Petitioner knew he was under investigation *before* he met with agents and, in fact, was escorted to OSI by a commanding officer for that purpose. Pre-Miranda, Petitioner admitted to knowing the purpose of the meeting and the role of OSI from witnessing an arrest of other military members; and agents informed him of their role as criminal investigators.

As narrated above, prior to issuing the Article 31(b) warning, OSI agents elicited biographical and basic identifying data, engaged in some casual conversation, and determined Petitioner's understanding of the purpose of meeting with OSI before explaining the role and process of OSI investigations. R. 746-815. As Wilson stated at the time, the purpose of the conversation (pre-Miranda) was to "tak[e] a little bit of time to make sure that [Petitioner was] 100 percent clear on what [they] do." R. 806. Lee explained their role included that they:

> take an allegation . . . we'll run an investigation . . . So we go from A all of the way around to, you know, talking – talking to the individual that might be accused, you know . . . But sometimes when we talk to people, too, depending upon the nature of the conversation we have to . . . advise people of their rights.

R. 794-95; see also R. 804-05.

It is true that Lee told Petitioner that reading him his rights was not like "watching Cops at home" and then shared a story of a relative. However, it is not clear that was intended to minimize Miranda or whether it was a notification that the scope and wording of an Article 31(b) advisement differs from Miranda. R. 814-15. The Article 31(b) warning occurred as follows:

> Agent Lee:   I'm going to read it right off of this card and it's going to say it word for word what's going on. It's going to say what I want to talk to you about . . . And then what we'll do after that

is we'll open up the dialogue and continue, you know, to have a good ole time . . .

I am Special Agent David Lee, a member of the -- of the Air Force OSI. *I am investigating you for the alleged incidence of Article 134[7], inappropriate images of children, of which you are suspected.* I advise you that **under the provisions of Article 31, UCMJ**, you have the right to remain silent, that is say nothing at all. Any statement you make, oral or written, may be used as evidence against you in a trial by court martial or in any other judicial or administrative proceedings. You have the right to consult a lawyer and have a lawyer present during this interview. You have the right to military legal counsel for your charge. In addition to military counsel, you are entitled to civilian counsel of your own choosing at your own expense. You may request a lawyer at any time during this interview. If you decide – if you decide to answer questions, you may stop the questioning at any time. Do you understand your rights?

---

[7] Under the UCMJ, Article 134 is referred to as the "General article." The statute provides:

Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court. As used in the preceding sentence, the term "crimes and offenses not capital" includes any conduct engaged in outside the United States, as defined in section 5 of title 18, that would constitute a crime or offense not capital if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States, as defined in section 7 of title 18.

| Petitioner: | Yes. |
|---|---|
| Agent Lee: | Do you want a lawyer? |
| Petitioner: | No. |
| Agent Lee: | And are you willing to answer questions? |
| Petitioner: | Yes. |

R. 815-17 (emphasis added). In addition, Lee explained that even if the incident did not involve Petitioner he might have some information that could turn the investigation in a different direction and repeated that "this investigation" was the reason Petitioner was "on hold" or otherwise flagged by finance. R. 817. Petitioner replied, "okay." Id. Thus, Petitioner was clearly aware of the reason for the interview; and Lee ensured that Petitioner knew why he was being interrogated. Moreover, agents did not ask any questions relating to the investigation pre-Miranda. R. 747-815.

Petitioner's encounter is distinct from that in Ross. In Ross, the significance of Miranda was minimized because:

> (1) prior to providing Ross with his Miranda rights, [the detective] minimized the significance of the rights by asserting they were only a matter of procedure; (2) prior to the warnings, the detective lulled Ross into a false sense of security by asserting that he was not arresting him at that time; (3) when Ross indicated a hesitancy in talking, the detective did not stop the interrogation immediately; and (4) rather than informing Ross that his prior incriminating statements could not be used against him, Ross was

reminded about his earlier admissions, implying that exercising the right to remain silent would be futile.

Ross, 45 So. 3d at 428.

Here, agents did not assert that the significance was only procedural. Agents confirmed that Petitioner knew he was under investigation and never made any assurances to Petitioner that he was not under arrest. Petitioner never made any statements that indicated a hesitation to speak with agents so that they should cease questioning him. Petitioner was never told that remaining silent would be futile. The "minimizing and downplaying" of Miranda are important factors to consider when a suspect "is provided with a tardy administration of the Miranda warnings." Ross, 45 So. 3d at 428. There was no tardy administration in Petitioner's case – Miranda was not "inserted in the midst of a coordinated and continuing interrogation." Id.

The state court found that although there was "some evidence" of minimizing of Miranda, Petitioner had "a full awareness of both the nature and the rights about [his] abandonment" and there was nothing that "made [the court] believe that [he was not] fully aware of those rights." R. 588-89. The court did not find any intimidation or coercion. R. 587-88. Moreover, given the totality of the circumstances, the court determined the actions of the agents were insufficient to overcome Petitioner's will considering all of the factors including his age, intelligence, and experience.

The decisions of the state and appellate courts were not contrary to nor involved an unreasonable application of clearly established federal law and were reasonable determinations based on the evidence presented. The Court must afford the factual determinations made by the state courts the presumption of correctness unless they are clearly erroneous. Harris v. Dugger, 874 F.2d at 762. Accordingly, this claim should be DENIED.

*3) Agents did not limit Petitioner's responses to "Yes" or "No."*

Petitioner maintains his statements were rendered involuntary because agents limited him to responding to questions with only a "yes" or "no." ECF No. 1, p. 13. Petitioner relies on Almeida v. State, 737 So. 2d 520 (Fla. 199) in support. Id. The state asserts agents did not limit Petitioner to "yes" or "no" responses. ECF No. 9, p. 21. Furthermore, reliance on Almeida is misplaced because, pre-Miranda, agents invited Petitioner to ask questions and did not "steamroll" Petitioner by ignoring any questions. ECF No. 9, pp. 21-22. Petitioner's claim fails.

Contrary to Petitioner's assertions, the directive to answer "yes" or "no" was related to the questions contained within the Article 31(b) warning, not to the subsequent interrogation questions. R. 813-814. Specifically, Lee explained:

> When I read you your rights, there's going to be some questions in there I'm going to ask you. I'm going to ask

> you the questions, I just need simple yes, no answers,
> okay. And there's a reasoning behind that . . . and I'm going
> to read right off . . . a wonderful little card . . . word for word.

R. 813-14. The questions requiring a "yes" or "no" response were: "do you understand your rights," "do you want a lawyer," and "are you willing to answer questions." R. 816. This is not to be confused with the remainder of the interrogation where nearly all of the questioning was open ended and included conversations about the computer Petitioner built, how and when he accessed various online platforms to view pornography, the type of pornography he viewed and downloaded, where the pornography was saved, and his preferences relating to pornography. R. 820-61. Given the nature of the questions, Petitioner could not be -- and was not -- limited to "yes" or "no" responses. The questions were not framed in a way that would require "yes" or "no" response; and Petitioner was not directed to solely respond "yes" or "no." Id.

Almeida held that "if at any point during custodial interrogation, a suspect asks a clear question concerning his or her rights, the officer must stop the interview and make a good-faith effort to give a simple and straightforward answer." 737 So. 2d at 525. Petitioner points to no time where he attempted to ask questions regarding his rights and was denied by agents but rather solely rests his claim on the directive to respond "yes" or

"no" as a "steamroll tactic." An objective review of the transcript suggests a different interpretation. The directive was limited to the three questions within the Article 31(b) warning. The state court findings are fairly supported by the record and are entitled to the Section 2254(d) presumption. Accordingly, this claim should be DENIED.

> ### 4) Agents did not overcome Petitioner's free will by not providing him with a rights waiver form at the outset of the interview.

Petitioner claims that the rights waiver form was not presented to him until after the interrogation was over "for fear that their efforts to cajole Petitioner into waiving his rights would be wasted." ECF No. 1, p. 13-14. The state correctly asserts that a written waiver is not necessary in order for a waiver to be voluntary; Petitioner waived his rights verbally on camera. ECF No. 9, p. 23. As evident from the suppression hearing, the military form 1168 contains the statement that a suspect understood his rights; and Petitioner initialed that section. R. 542.

"A written waiver is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009). See also United States v. McDaniel, 463 F.2d 129, 135 (5th Cir. 1972) (a confession was admitted despite defendant's refusal to sign a waiver because "a detainee may make statements that are quite voluntary without signing a written waiver.").

Agent Wilson testified at the suppression hearing that Petitioner was read his rights, indicated verbally that he understood his rights, and voluntarily waived those rights; and, as a matter of military procedure, Petitioner signed the statement at the end of the interview confirming the same. R. 541-545, 564, 1000-18. The state court found that Petitioner's statements were voluntary; and the decision is not contrary to federal law and is based on a reasonable determination of the evidence presented. Accordingly, this claim should be DENIED.

To the extent that Petitioner suggests generally that Petitioner's age, experience, and mental health history made him susceptible to psychological coercion that rendered his statements involuntary (ECF No. 1, p. 14), the state court considered these factors when evaluating the "totality of the circumstances" and specifically found that Petitioner was at least of average intelligence, was an adult at 21 years old, lived a "sheltered" life somewhat; and he was not in any distress. Petitioner's will was not overborne by the conduct of the agents. The state court factual determinations are presumed to be correct. Conveniently, the matter of voluntariness was, essentially, conceded during Petitioner's arguments at the sentencing hearing -- his cooperation with law enforcement was so freely given that a downward

departure was warranted. Ultimately, the record supports the state court's conclusion that Petitioner freely and voluntarily waived <u>Miranda</u>.

Petitioner neither claims nor presents any record evidence to suggest he did not understand the waiver. Petitioner does not argue that the warning itself was defective. Petitioner's argument is that his will was overborne by the tactics of OSI agents. Given his age, his fitness to serve in the United States military and hold a "secret" security clearance, his clear understanding that he knew days earlier that he was under investigation, and his expression of remorse near the end of the interview, do not support a conclusion that Petitioner was coerced, "cajoled," or otherwise manipulated into giving involuntary statements to the agents.

Petitioner fails to show that the state court's rejection of his motion to suppress resulted in either an unreasonable application of federal law or an unreasonable determination of the facts. <u>See</u> <u>also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare.").

## V.   Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the Court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by filing objections to this Report and Recommendation.

Leave to appeal *in forma pauperis* should also be denied. See Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed,

the court may certify appeal is not in good faith or party is not otherwise entitled to appeal *in forma pauperis*).

## VI.   Conclusion and Recommendation

For the reasons stated, it is respectfully **RECOMMENDED** that the Court **DENY** Plaintiff's § 2254 petition (ECF No. 1). It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal *in forma pauperis* be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on July 26, 2021.

**s/ Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).